| | | |
|---|---|---|
| **NORMAN A. STEIBEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:07CV2089SNLJ** |
| | ) | |
| **EDWARD J. LOCKE, JR., ET. AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff has filed this §1983 action alleging that his Fourth and Fourteenth Amendment rights were violated when allegedly excessive force was used to effectuate an allegedly unlawful arrest of the plaintiff. Plaintiff further asserts a claim of municipal liability against the police officer's defendant municipal employer; a claim for *respondeat superior* against said employer; as well as state law claims for assault, battery, and false arrest.[1] This matter is before the Court on defendants' motion for summary judgment (#35), filed March 13, 2009. Responsive pleadings have been filed. This cause of action is set for trial on the Court's trial docket of June 3, 2009.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material

---

[1]The original complaint has three (3) different plaintiffs, each with a different "incident" giving rise to their particular cause of action. On or about February 7, 2008 this Court granted defendants' motion to sever (#9). *See*, Court Order #14. Plaintiff Steibel's claims are contained in Count I (unlawful arrest and excessive force); Count III (municipal liability); Count IV (*respondeat superior*); and Count V (state law claims for assault, battery and false arrest).

fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Citrate, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976).

Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); *see*, Mayer v. Nextel West Corp., 318 F.3d. 803, 806 (8th Cir. 2003) *citing* Keathley v. Ameritech Corp., 187 F.3d. 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Systems, Inc., 348 F.3d. 732, 733-34 (8th Cir. 2003) *quoting* Wilson v. Int'l Bus. Mach. Corp., 62 F.3d. 237, 241 (8th Cir. 1995); Girten v. McRentals, Inc., 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment."). Thus, the nonmoving party cannot rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d. 953, 957 (8th Cir. 1995).

A few preliminary matters must be addressed prior to the Court's ultimate review and determination of the pending summary judgment motion. Firstly, upon review of the plaintiffs' response to the instant summary judgment motion, it appears that he is attempting to frame his claims in Count I as a First Amendment issue, rather than as a Fourth Amendment issue. Plaintiff's Count I is, and has always been, a claim for unlawful arrest and excessive force in violation of the Fourth Amendment (and Fourteenth Amendment). Plaintiff has never sought leave to amend his complaint, and at this late date, the Court believes raising First Amendment issues is highly prejudicial to the defendants. The Court will address plaintiff's claims in Count I strictly as Fourth Amendment illegal arrest and/or excessive force claims. However, although the Court finds all argument and disputes as to plaintiff's actions in the context of a freedom of speech context to be immaterial and irrelevant to the case before the Court, the Court will briefly address plaintiff's actions leading up to his arrest in the context of a freedom of expression matter only in so far as it directly relates to the Fourth Amendment claims.

Secondly, it appears that plaintiff is also attempting to argue, for the first time in his responsive pleading, that the municipal ordinance (St. Louis County Ordinance, §701.110 **Interfering with Officer Unlawful**) is unconstitutional. Nowhere in his complaint does plaintiff make any claim asserting that any municipal ordinance (or state statute) is unconstitutional, for whatever reason; thereby, making his arrest unlawful. Again, the Court finds such argument and dispute immaterial and irrelevant to the case at hand; however, the Court will briefly address the matter only in connection with the Fourth Amendment claim for unlawful arrest.

Furthermore, in his response (#41), plaintiff "hereby abandons the failure to train theory of municipal liability." Document #41, pg 23. Thus, it appears that plaintiff is now pursuing a claim for municipal liability only on three (3) theories of municipal liability: defendant Locke as a final policy-maker; delegation to defendant Locke full authority to make policy; and a pattern of transgressions (known to defendant City of Bella Villa). Finally, on May 12, 2009, plaintiff filed a motion to dismiss Count V (state law claims for assault, battery, and false arrest)(#46); said motion was granted by the Court on May 13, 2009.

The Court makes the following findings of fact relevant to the case before the Court and the issues raised in the instant summary judgment motion.[2] Plaintiff Steibel owns a business known as Custom Metal Works, an automobile repair shop. It is not unusual for him to have several motor vehicles on his premises either awaiting repair or pickup by a customer. The business is located on the corner of Bayless Road and Pardella Ave., approximately two (2) blocks from the defendant City of Bella Villa (hereinafter referred to as simply "Bella Villa") city limits.

On the early evening of October 18, 2007 defendant Locke, while on patrol[3], stopped a motor vehicle alongside of plaintiff's business for a traffic violation. Defendant Locke exited his patrol car and approached the driver's side of the stopped vehicle. Upon seeing the stopped vehicle and defendant Locke approaching the driver, plaintiff exited his business and walked towards the car and defendant Locke. Plaintiff had never had any prior contact with defendant Locke. Plaintiff's Deposition, pgs. 23-24. At the time plaintiff began walking towards defendant

---

[2]The facts as set forth by the Court are largely derived from the defendants' statement of facts, the individual parties' affidavits, affidavit of Dr. Stephen M. Palmer, various deposition testimonies, and exhibits filed by the parties; including a video taping of the events leading up to the plaintiff's arrest. The video taping was automatically activated by defendant Locke's patrol car dashboard camera when his emergency lights came on while pursuing a traffic violator prior to his encounter with the plaintiff. The parties agree that the video only shows a portion of the encounter between the plaintiff and the defendant. Exhibit A to defendant Locke's affidavit (#36-3). For the record, the Court has reviewed the video *in camera* several times. In opposition to the instant motion and the defendants' statement of material facts, the plaintiff admits to a majority of the facts stated; however, has objected to some and set forth his own statement of material facts. The Court has reviewed the objections and/or denials and finds same to be either immaterial or irrelevant to the issues at hand; e.g. where the traffic violator's car was stopped or whether plaintiff had complained to other officers about stopping traffic violators and "blocking" plaintiff's parking lot. His objections fail to create any genuinely disputed issues of fact; however, any "disputed fact" supported by objective evidence in the record will be duly considered. The Court has further carefully reviewed the plaintiff's "additional material facts" and finds that these "material facts" are largely irrelevant to the claims as contained in the plaintiff's complaint and/or the issues present in the instant summary judgment motion. They consist of generalizations, speculations, and legal conclusions for the most part. However, in the rare instance an "additional material fact" is proffered by the plaintiff and supported by objective evidence in the record and relevant to the claims present in this lawsuit, it will be considered in the Court's summary judgment determination.

[3]Defendant Locke works for the Bella Villa police department in dual roles: chief of police, and a patrol officer.

4

Locke, there were several people on his business lot, including Joe Strantz. Plaintiff's Deposition, pgs. 25-27, 33.

As plaintiff approached defendant Locke, he repeatedly directed defendant Locke to move his patrol car because it was blocking a customer who wanted to leave the lot. Plaintiff's Deposition, pgs. 28-30. Defendant Locke told plaintiff to move back several times because he was interfering with police business. Plaintiff's Deposition, pgs. 32-33 Locke Deposition, pgs. 13-14; Locke Affidavit. However, plaintiff kept approaching, waving his arms, yelling, and using profanity. Plaintiff's Deposition, pgs. 31-32; Plaintiff's Response to Defendants' Statement of Material Facts (#41-2), ¶¶7, 8; Locke Deposition, pgs. 15-17; Locke Affidavit.

Believing plaintiff to be interfering with his duties in attending to the traffic stop, and that plaintiff's mannerisms were hostile in nature, Locke came around the car intending to handcuff plaintiff. Locke Deposition, pgs. 16-20. Plaintiff contends that he was approximately twenty (20) feet away from Locke, and that Locke "went off", "went nuts", and "came at full charge and bashed me into a van that was sitting there.". Plaintiff's Deposition, pgs. 30-31, 43; see also, pg. 54. Defendant Locke contends that he came around the car, plaintiff raised his arm, Locke grabbed at it while plaintiff kept backing up, then they both fell on the ground. Locke's Deposition, pgs. 20-23; Locke Affidavit. Plaintiff "admits that Steibel was not fully compliant with Chief Locke's efforts to place Steibel in handcuffs." Plaintiff's Response (#41-2), ¶15. Plaintiff "admits that the handcuffing process entailed a short struggle between Steibel and Chief Locke. Plaintiff admits that both men ended up on the ground.". Plaintiff's Response (#41-2), ¶16. Plaintiff believes his leg/knee gave out during the "struggle". Plaintiff's Deposition, pgs. 46, 54.

Plaintiff fell forward, face down, and Locke continued to attempt to get plaintiff's arms behind his back to place him in handcuffs. Plaintiff contends that as Locke grabbed for one arm, he placed his knee in plaintiff's back, and when plaintiff attempted to roll over to get up, Locke put his knee into the plaintiff's back again, and finished handcuffing. Plaintiff's Deposition, pgs. 57-59. Locke denies placing his knee in plaintiff's back at anytime while struggling with him to handcuff him. Locke Deposition, pg. 24. He asserts that during the struggle he kept shouting at

plaintiff to stop resisting, that plaintiff tried to get up, and Locke "shoved him down and finally got his arms behind his back."  Locke Deposition, pg. 43-44.

While the "handcuffing struggle" was going on, plaintiff's employees began surrounding the two men, and Locke pulled out his chemical spray and told the employees to get back or he would spray them.  Plaintiff's Deposition, pg. 58; Locke's Deposition, pgs. 25-27.  The employees complied.  Locke Deposition. pg. 27.

Upon handcuffing plaintiff, Locke observed plaintiff bleeding from his wrists and his elbow.  At the time of this incident, plaintiff suffered from Wegener's Disease.  Plaintiff's Deposition, pgs. 7-8.  Plaintiff contends that this disease causes him "to have too many white cells" and that he has "lost an eye, a hand, and my right leg."  Plaintiff's Deposition, pg. 8.[4]  This disease causes his skin to become fragile, and that he easily sustains skin tears and abrasions.  Plaintiff's Response (#41-2), ¶¶19, 20, and 21.; Affidavit of Dr. Stephen Palmer.  From 2000-2001, plaintiff took 30 mg. of prednisone daily which caused him to "bruised real easy".  Plaintiff's Deposition, pg. 78.  At the time of this incident, plaintiff had been on a reduced medication regimine of  5 mg. of prednisone daily for several years.  Prolonged prednisone use can cause the skin of people who are diagnosed with Wegener's Disease to become atrophic and fragile.  Palmer Affidavit.  At the time of this incident, Locke was unaware of plaintiff's medical condition, and was not informed of it until after he was handcuffed and noticed that plaintiff was bleeding.  Locke Deposition, pg. 27; Plaintiff's Response (#41-2), ¶23.

An ambulance was called, plaintiff's handcuffs were removed, and he was taken to St. Anthony's Hospital's emergency room.  While plaintiff was in the ER, Locke got two (2) witness statements[5]; then returned to the police station to write up his report.  Locke Deposition, pgs. 13, 29.

---

[4]Plaintiff further explains that by "losing his hand" he means he has "no control over it"; that he can no longer move it correctly.  Plaintiff's Deposition, pg. 8.  The Court presumes that this is the same meaning he attaches to the "lost" of his eye and right leg; i.e. that they no longer function fully, not that he actually no longer has them as an appendage.

[5]One is from Joe Strantz; the other from the driver "Chris" of the vehicle stopped by Locke.  Defendants' Exhibit C to Locke Affidavit.

Meanwhile, plaintiff was treated in the St. Anthony's Hospital ER. According to the plaintiff, he was in the ER for "[A]bout four hours. Waiting mostly." Plaintiff's Deposition, pg. 94. According to the plaintiff, his medical treatment was as follows:

"Q. And what did the emergency room doctor to for you in the hospital?
A. Just cleaned upon all the pieces of gravel out, you know, stuck, and the dirt out of things, cleaned this, bandaged it."
Q. Cleaned you left wrist?
A. Yeah.
Q. And bandaged your left wrist?
A. Yeah.
Q. Anything else?
A. Just little spots on me. Put little - it would be like a Band-Aid. They take a piece of - - little bitty gauze pad, tape, and stick over all the holes.
Q. How many gauze pads or little pieces of tape did you have on you when you left?
A. Probably ten. I don't know.
Q. And where were these?
A. On my back, my side.
Q. Okay. How many did you have on your back?
A. I don't know. I didn't count them.
Q. Okay. So your back and your side?
A. Yeah.
Q. Where else?
A. Two in my cheek.
Q. Two of those gauze pads on you cheek?
A. Yeah. I know for sure there was two there. I didn't count on the back or nothing.
Q. Okay. Any other places that you had them?
A. Just a couple in the arm. Both arms had one or two in it, you know.
Q. Okay. Did you take pictures of you with the gauze or tape on?
A. No.
Q. How long did yo have to keep that tape on?
A. We took it off for a few of them pictures and put it back over to show those things.
Q. Oh, okay. I see.
A. Just so you could see what was under there, you know.
Q. Okay. So did you take any pictures of your face, the one on your face?
A. I don't know. I would have thought we would have.
Q. Well, how long did you keep the gauze on the little places on your arms?
A. Well, the next day my wife and my daughter-in-law started putting Band-Aids on it. You know they'd take them and wipe them off with – like hydrogen peroxide. They put that on a cotton ball, wipe it off, and put a Band-Aid on it.
Q. Okay. And how long did you have the gauze on your left wrist?
A. That went pretty long. I had to change that a lot.
Q. How many days?
A. That was - - We took the pictures - - I bet it was three weeks

7

or something.  It was a pretty long time."

Plaintiff's Deposition, pgs. 94-96.  No other medical treatment was received at the ER on

October 18, 2007.

Despite being advised by the ER doctor to see another doctor for follow-up, plaintiff did

not.

> "Q.  Okay.  Did the emergency room doctor tell you to go to follow up
> with another doctor?
> A.  Yeah.
> Q.  Was that Dr. Helton?
> A.  I don't know.
> Q.  Do you know who Dr. Helton is?
> A.  Uh-uh.
> Q.  Did you follow up with another doctor?
> A.  No.
> Q.  Why not?
> A.  Never got around to it.
> Q.  Pardon?
> A.  Just never got around to it.
> Q.  Okay.
> A.  I went to Florida."

Plaintiff's Deposition. pg. 96.[6]

At some point while plaintiff was in the ER, Locke arrived and told plaintiff he could leave

(after being treated), but that Locke was going to apply for state charges.  Locke Deposition, pgs.

32-33.  Locke did apply for state charges but the St. Louis County Prosecutor's Office declined

to press charges against the plaintiff.  Locke Deposition, pgs. 33-35.

Shortly after receiving medical treatment at the ER, plaintiff went to Florida.  Plaintiff's

Deposition, pgs. 48, 96.  While in Sarasota, Florida he got a "scan" and some unidentified person

told him he had "lipis" **[sic]** or "lupus" or "a small tear" in his right knee.  Plaintiff's Deposition,

pgs. 48-49.     Plaintiff then saw an unidentified chiropractor in Bradenton, Florida.

> "Q.  Okay.  What did the chiropractor tell you about your knee?
> A.  He thought it was something that was coming out of my back
> going down there to cause the knee and that to mess up.
> Q.  Okay.  so he didn't think there was anything wrong with
> the knee; it was just something - - some problem with your
> back?

---

[6]Neither party filed any medical records regarding plaintiff's treatment in St. Anthony
Hospital's ER the evening of October 18, 2007.  Plaintiff's deposition testimony is the only
"evidence" of plaintiff's medical treatment that night.

A.  Yeah.  And then he looked a the thing I got from - - My doctor
told me anything you could mail it to her, wherever you're at,
she sends a copy to you, she gives you a copy of everything, you
know, and that's where it said that you had a torn whatever it was,
a little tear, something in the kneecap.  And I showed it to him, and he
said that should heal up, that should be no big thing.
Q.  That's what the chiropractor said?
A.  Yeah.
Q.  Okay.  So whatever this was should heal up is what the
chiropractor said?
A.  That's what he said, but it hasn't."

Plaintiff's Deposition, pgs. 50-51.  Plaintiff has not seen any other doctor, chiropractor, or other

medical treatment provider since getting the "scan" and seeing the chiropractor in Florida during

the first week of November 2007.  Plaintiff's Deposition, pg. 52.

Prior to the incident in October 2007, plaintiff had been wearing a knee brace on his right

knee; in fact, he was wearing it at the time of the incident.  Plaintiff's Deposition, pgs. 47-48.

Plaintiff had pain in the knee prior to the incident which inhibited his ability to walk and was told

to wear the brace by his regular doctor.  Plaintiff's Deposition, pg. 47.  However, plaintiff was

never told by his regular doctor what was wrong with his right knee or why he should wear a

brace.  Plaintiff's Deposition, pgs. 47-48.  Prior to the incident, plaintiff states he could walk a

block or so but that after the incident, he could no longer walk this distance without additional

pain.  Plaintiff's Deposition, pgs. 47-48, 54.

As for his left arm or wrist, plaintiff has no residual problems or pain associated with the

incident of October 18, 2007.

"Q.  And have you told me about all of the medical treatment that
you have received?
A.  Yeah.  You know everything.
Q.  Okay. No other medical treatment?
A.  No.
Q.  Okay.  And are there any problems that you're having with your
left arm or wrist now?
A.  Not really.  It's the only one that works good yet or pretty good.
Q.  Okay.  So in terms of, you know, any pain or function, it's as
it always was, is that correct?
A.  Yeah.
Q.  Okay.
A.  When you get towards the 70 mark, it all aches anyway pretty much,
you know.
Q.  I'm sorry?
A.  Once you get towards that 70 mark, when you get out of bed in
the morning, stuff aches.

Q. That's just the way it is; huh?
A. That's just the way it is."

Plaintiff's Deposition, pgs. 99-100.

During the relevant time-period, St. Louis County had an ordinance in effect which provides: "It is unlawful for any person to interfere in any manner with a police officer or other employee of the County in the performance of his official duties or to obstruct him in any manner whatsoever while performing any duty." St. Louis County Ordinance §701.110. Furthermore, Missouri Statute §575.150 provides, in pertinent part:

> "**575.150. Resisting or interfering with arrest**
> 1. A person commits the crime of resisting or interfering with arrest, detention, or stop if, knowing that a law enforcement officer is making an arrest, or attempting to lawfully detain or stop an individual or vehicle, or the person reasonably should know that a law enforcement officer is making an arrest or attempting to lawfully detain or lawfully stop an individual or vehicle, for the purpose of preventing the officer from effecting the arrest, stop or detention, the person:
> (1) Resists the arrest, stop or detention of such person by using or threatening the use of violence or physical force or by fleeing from such officer; or
> (2) Interferes with the arrest, stop or detention of another person by using or threatening the use of violence, physical force, or physical interference.
> 2. This section applies to arrests, stops or detentions with or without warrants and to arrests, stops or detentions for any crime, infraction, or ordinance violation.

§575.150(1) and (2) R.S.Mo.

Defendant Locke graduated from the Mineral Area Police Academy in 2001.[7] He is a licensed Class A law enforcement officer. At the time of the alleged incident, Locke had been a Bella Villa police officer for approximately six (6) years. At the time of the alleged incident, Locke served as the Bella Villa Police Chief, as well as a patrol officer. Chief Locke oversees the

---

[7] Several other lawsuits have been filed by plaintiff's counsel naming defendant Locke and City of Bella Villa as defendants. A number of these lawsuits have been assigned to this Court for adjudication: Schmidt v. City of Bella Villa, et. al., 4:06CV265SNLJ; Cook v. City of Bella Villa, et. al., 4:06CV1531SNLJ; and Tunnel v. City of Bella Villa and Officer Christopher Eveland, 4:07CV77SNLJ. The Court has made prior factual findings regarding defendant Locke professional training, the governmental infrastructure of Bella Villa, and the administrative relationship between the City of Bella Villa and the Bella Villa police department. The Court takes judicial notice of its prior factual findings regarding the afore-mentioned matters; as well as consideration of defendant's Locke's affidavit regarding these same matters.

day-to-day operations of the Bella Villa police department. Chief Locke manages the Bella Villa police department to ensure that the department and its staff are operating properly and efficiently and that appropriate monthly reports are provided to the State.

The City of Bella Villa pays for Chief Locke's continuing education courses and training in various law enforcement techniques. Chief Locke has successfully completed numerous courses in law enforcement and instructor training.

The Mayor and the Bella Villa Board of Alderman supervise Chief Locke and the Bella Villa police department.[8] Chief Locke reports to the Board and the Mayor on a continuous basis regarding his job performance and other matters germane to his duties for the City of Bella Villa. Chief Locke must seek and obtain approval from the Board of Aldermen to issue policies related to the administration of the Bella Villa police department.

At the time of this incident, there has been two (2) written complaints filed with the City of Bella Villa regarding defendant Locke's job performance. One is an unidentified writer from Indiana who complained about the way Locke treated him during a traffic stop. Plaintiff's Exhibit 12 - trial testimony of Jason Peery (Cook v. City of Bella Villa; Case No. 4:06CV1531SNLJ), pg. 202. Upon reviewing a videotape of the traffic stop, the Board of Alderman concluded that the complaint was meritless.

> "Q. Have you received any complaint about Chief Locke's performance?
> A. We have.
> Q. We received a letter from an individual in Indiana who had been pulled over on I think it was a Sunday afternoon and he complained about how Chief Locke had treated him and he actually, you know, typed in quotes, you know, things that Chief Locke had said to him.
> The way that we dealt with that was at our next meeting[9] we reviewed the videotape of the alleged incident and as a board we

---

[8]In their memorandum in support of summary judgment motion (#37), defendants state "Mayor Joanne Yates and Chief Locke each aver that the Mayor and Board of Aldermen set the policies for the City of Bella Villa and its police department." Document #37, pg. 9. There is no deposition testimony or affidavit by any "Mayor Joanne Yates" before this Court for consideration. However, as stated previously, this Court is intimately familiar with the infrastructure of the City of Bella Villa, and takes judicial notice of its prior factual findings on this matter.

[9]At the time of his trial testimony, Mr. Peery was a member of the Board of Aldermen for the City of Bella Villa.

> found that the videotape did not support the allegations whatsoever; that the things that he claimed were said just were never said, the tone just wasn't there."

Plaintiff's Exhibit 12, pg. 202.

At his deposition, Chief Locke testified regarding Bella Villa's receipt of a written letter of complaint from "DZ" regarding her treatment by Chief Locke during a traffic stop on May 6, 2007. The letter ostensibly asserts that Chief Locke was "rude and belligerent and angry to her." Locke Deposition, pgs. 49-50. Chief Locke denies being "rude" to DZ during this traffic stop. Locke Deposition, pg. 51.

Plaintiff contends that defendant Locke illegally arrested him in violation of the Fourth Amendment, and in effectuating the arrest, used excessive in violation of the Fourth Amendment. Plaintiff further contends that Bella Villa is liable because 1) defendant Locke is a "final policy-maker" for the Bella Villa police department; or 2) Bella Villa has delegated to defendant Locke "final policy-making" authority for the Bella Villa police department; or 3) Bella Villa has a custom or policy of allowing its police officers, specifically defendant Locke, to engage in a "pattern of transgressions" based upon letters of complaint and other lawsuits filed by plaintiff's counsel against Bella Villa and defendant Locke. Finally, it appears that plaintiff contends that the City of Bella Villa is liable under a theory of *respondeat superior.*

Defendants contend that defendant Locke had probable cause to arrest plaintiff for interfering with the traffic stop in progress; and that defendant Locke used no more force than reasonably necessary to arrest plaintiff.[10] Additionally, defendants assert that defendant Locke is entitled to qualified immunity on both Fourth Amendment claims. As for municipal liability, the City argues that the evidence is undisputed that the Mayor and the Board of Alderman are the final policy-makers for the police department, not defendant Locke. It also argues that no other complaints regarding unlawful arrest or excessive force by defendant Locke have been made to

---

[10]There is confusion in the pleadings as to whether defendant Locke "arrested" plaintiff or just "seized" plaintiff. Plaintiff considers the actions of the defendant to be an "arrest; however, defendant Locke asserts that he did not "arrest" plaintiff. Since plaintiff believed himself to be "arrested" and has filed this complaint asserting a Fourth Amendment violation for unlawful arrest, the Court will address the claim contained in Count I as an "unlawful arrest".

the City; and that counsel's other lawsuits are not proper evidence of a "pattern of transgressions". Finally, defendants argue that municipalities are not subject to *respondeat superior* or vicarious liability under §1983.

## Count I - Claim for Fourth and Fourteenth Amendment Violations against
## Defendant Locke - Unlawful Arrest

Plaintiff contends that defendant Locke arrested him without probable cause. Plaintiff asserts in his complaint that the arrest was without probable cause because plaintiff was not, among other things, committing a crime at the time, a safety threat, or resisting arrest. He raises for the first time in his responsive pleading that he was unlawfully arrested for using obscenities towards defendant Locke. In the alternative, he argues that the arrest was unlawful because it was made pursuant to an unconstitutional ordinance and/or the arrest was made outside the city limits of Bella Villa.

The Fourth Amendment prohibits unreasonable seizures. It is well-established that an arrest is a seizure subject to Fourth Amendment scrutiny. A police officer may make an arrest without violating the Fourth Amendment if the officer has probable cause to believe that an offense has been committed in the officer's presence, even if the offense is a "very minor one". Davis v. City of Albia, et. al., 434 F.Supp.2d. 692, 702 (S.D.Iowa 2006) *citing* Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); *see also*, Lawyer v. City of Council Bluffs, 361 F.3d. 1099, 1106 (8th Cir. 2004). A warrantless arrest is lawful if probable cause exists to believe that the person arrested has violated any applicable statute, even one not contemplated by the arresting officer at the time of the arrest. Lawyer, at 1106; Arnett v. Mataya, 995 F.2d. 121, 124 (8th Cir. 1995); Davis, at 702.

> "An officer has probable cause to arrest a suspect without a warrant if the `facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

Arnott, at 124 *quoting* Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); *see also*, Smithson v. Aldrich, 235 F.3d. 1058, 1062 (8th Cir. 2000). An officer is entitled to rely on his or her training

and experience in considering the circumstances, and should proceed in the manner of a reasonably cautious officer. Hannah v. City of Overland, Mo., 795 F.2d. 1385, 1389 (8th Cir. 1986). "'The probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" Hannah, at 1389 quoting United States v. Wallraff, 705 F.2d. 980, 990 (8th Cir. 1983).

Defendant Locke arrested plaintiff for interfering with the traffic stop. Locke contends that despite being told to stay back, plaintiff kept approaching him in a hostile manner; i.e. waving his arms around and cussing at him. Locke believed that plaintiff's actions were a significant distraction for Locke to perform his duties and further, plaintiff's actions were creating an unsafe environment for Locke to perform his duties. Plaintiff contends that the video creates genuine issues of material fact directly contradicting Locke's testimony, and supports his testimony that he remained approximately twenty (20) feet away from Locke, that he only asked several times "nicely" for Locke to move his police car, and that he never approached Locke.

Having viewed the video several times, it contradicts plaintiff's version of material events giving rise to his arrest. Contrary to plaintiff's assertion, the video shows him coming towards the car, stopping at the passenger side. It shows him waving his arms. Although there is no audio, the video shows agitated communication between the two men. He admits that Locke told him that he was interfering with police business. Plaintiff admits to using profanity, and yelling at Locke while Locke was effectuating the traffic stop. Even viewing the video in a light most favorable to the plaintiff, it still shows plaintiff waving his arms, approaching the car, stopping at the passenger side. The video coupled with plaintiff's own testimony that he was upset because the police car was allegedly blocking one of his customer's car and preventing that customer from leaving, that Locke told him he was interfering with police business, and that he was yelling and using profanity towards Locke fails to create any material issues of fact as to probable cause to arrest plaintiff for interfering with a police officer in the performance of his duties. No reasonable juror could find, that under the totality of circumstances facing Locke, plaintiff was not acting in a confrontational, belligerent, and possibly threatening manner preventing Locke from performing his duties.

Locke had probable cause to arrest plaintiff for interfering with the performance of his official duties. At the time, Locke believed plaintiff to be in violation of a St. Louis County ordinance. Plaintiff contends that this ordinance is unconstitutional under City of Houston v. Hill, 482 U.S. 451 (1987) and its progeny. City of Houston v Hill, *supra*. held that an ordinance which allowed a police officer to make an arrest based on protected speech alone was unconstitutional. This is not the case here. Plaintiff's use of obscenities was not the sole cause for his arrest. It was his agitated mannerisms, his refusal to obey one or more directives to step back, his loud tone of voice, and the obscenities which all combined to make a tense and perceived threatening situation interfering with Locke's ability to process a traffic violation. The language of St. Louis County Ordinance §701.110 may be broad but it does not single out words or language as the catalyst for arrest. Furthermore, even if this Court were to take the drastic action of declaring the ordinance unconstitutional, the fact remains that Missouri Statute §575.150 is applicable in this case, and there has been no contention that it is unconstitutional. Thus, Locke still had probable cause to arrest plaintiff.

Finally, it is undisputed that plaintiff's arrest took place outside the city limits of Bella Villa. However, since the arrest was made with probable cause, while Locke was performing his official duties, no Fourth Amendment violation occurred. Rose v. City of Mulberry, 533 F.3d. 678 (8th Cir. 2008).

Defendants also assert that Locke is entitled to qualified immunity as to the claim of unlawful arrest.

The inquiry into a qualified immunity defense is two-fold: whether the facts, construed in the plaintiff's favor, show that the officer's conduct violated a constitutional right and whether that right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001). "The doctrine of qualified immunity protects government officials `from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, - U.S.- , 129 S.Ct. 808, 815 (2009) *quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The protection of qualified immunity applies regardless of whether the government official's act is `a mistake of law, a mistake of fact,

or a mistake based on mixed questions of law and fact.'" Pearson v. Callahan, 129 S.Ct. at 815 *quoting* Groh v. Ramirez, 540 U.S. 551, 567 (2004).

For a right to be "clearly established" , "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Prior to the Supreme Court's ruling in Pearson v. Callahan, *supra.*, courts generally utilized the afore-referenced two-step process when considering an officer's claim of qualified immunity. Pearson v. Callahan, however, left to the courts' discretion the order in which a court addresses the two-steps process. Pearson v. Callahan, 129 S.Ct. at 818-22. Furthermore, if a court should address whether a plaintiff's constitutional rights were violated in the first place, and determines that the plaintiff has failed to meet his/her burden of proving that an issue of material fact exists regarding whether a constitutional right was violated, it need not reach the second step of a qualified immunity analysis; i.e. whether the right was clearly established. Ballard v. Heineman, 548 F.3d. 1132. 1135 n.2 (8th Cir. 2008) *citing* Janis v. Biesheuvel, 428 F.3d. 795, 799 (8th Cir. 2005).

Having found that the plaintiff failed to meet his burden of proving that an issue of material fact exists regarding whether his Fourth Amendment right against unlawful arrest was violated, the Court finds no need to go any further with a qualified immunity inquiry. Thus, having found no constitutional violation as to plaintiff's arrest, defendant Locke is entitled to qualified immunity on this claim.

## Count I - Claim for Fourth and Fourteenth Amendment Violation
## Against Defendant Locke - Excessive Force

Plaintiff contends that defendant Locke used more force than was reasonably necessary to effectuate the arrest. He contends that he was "slammed" up against a van, hitting his head and back. He further contends that his right leg gave out, he fell to the ground, and while on the ground, Locke kneed him in the back twice, and handcuffed him so tightly as to make his left

16

wrist bleed. He asserts that he suffered bruises, bleeding, scrapes, pain, and continuing problems with his right knee as a direct result of the force used.

Defendant Locke contends that only that force reasonably necessary to handcuff plaintiff was used. He contends that plaintiff was struggling to resist being handcuffed, and that made the process more difficult. He further contends that plaintiff's pre-existing medical conditions account for the unusual tearing of skin and bleeding. He further contends that any "pain and suffering" was minimal and temporary. Finally, he contends that any lingering effects of the incident are due to plaintiff's medical condition and age.

The right to be free from excessive force in the course of an arrest, investigatory stop, or other "seizure" by law enforcement officials is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizure of the person. Graham v. Connor, 490 U.S. 386, 395 (1989); Mann v. Yarnell, 497 F.3d. 822, 825 (8th Cir. 2007) citing Guite v. Wright, 147 F.3d. 747, 750 (8th Cir. 1998)(citations omitted). Violation of this right may be redressed in a §1983 action. Mann, at 825; Crumley v. City of St. Paul, Minn., 324 F.3d. 1003, 1007 (8th Cir. 2003). Not every push or shove rises to the level of a constitutional violation. Samuelson v. City of Ulm, 455 F.3d. 871, 875 (8th Cir. 2006): Guite, at 750. Instead, the force employed by a law enforcement official is not considered excessive and a violation of the Fourth Amendment if such force was "objectively reasonable under the particular circumstances." Ngo v. Storlie, 495 F.3d. 597, 602 (8th Cir. 2007); Guite, at 750. "'Circumstances such as severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct.'" Littrell v. Franklin, 388 F.3d. 578, 583 (8th Cir. 2004)(internal citation omitted). The reasonableness of the officer's use of force is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Janis v. Biesheuvel, at 799 quoting Graham v. Connor, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a

particular situation." <u>Gill v. Maciejewski</u>, 546 F.3d. 557, 562 (8th Cir. 2008) *quoting* <u>Graham v. Connor</u>, 490 U.S. at 396-97; <u>Wertish v. Krueger</u>, 433 F.3d. 1062, 1066 (8th Cir. 2006).

    "An `actual injury' must be shown to support an excessive force claim under the Fourth Amendment." <u>Hanig v. Lee</u>, 415 F.3d. 822, 824 (8th Cir. 2005) *citing* <u>Dawkins v. Green</u>, 50 F.3d. 532, 535 (8th Cir. 1995); *see also*, <u>Mann</u>, at 826 *citing* <u>Crumley</u>, at 1007 (a court may evaluate the extent of the plaintiff's injuries in determining the reasonableness of the force used). A plaintiff sustains actual injuries, for example, when s/he is bruised or has lacerations. <u>Dawkins</u>, at 535. However, such injuries still do not reach the level of a constitutional violation if considered to be the result of "de minimus use of force". *See*, <u>Hunter v.Namanny</u>, 219 F.3d. 825, 831 (8th Cir. 2000); *see also*, <u>Wertish v. Krueger</u>, 433 F.3d. 1062, 1067 (8th Cir. 2006)(holding that less than permanent aggravation of an existing shoulder condition as well as minor scrapes and bruises are *de minimus* injuries insufficient to support a Fourth Amendment excessive force claim). Thus, even being handcuffed tightly, without evidence of a long-term or permanent injury, does not amount to unconstitutional excessive force. <u>Crumley</u>, at 1008; *see*, <u>Foster v. Metro Airports Commission</u>, 914 F.2d. 1076, 1082 (8th Cir. 1990).

    Viewing the evidence in this case in a light most favorable to the plaintiff, the Court determines that Steibel has failed to meet his burden of proving that an issue of material facts exists as to whether the amount of force used was objectively unreasonable under the circumstances; therefore, failing to show that Locke violated plaintiff's Fourth Amendment right against the use of excessive force during an arrest.

    At his deposition, plaintiff concedes that he could have been resisting Locke's attempts to get his arms behind his back to handcuff him, but that such resistence would have been useless. Plaintiff's Deposition, pgs. 57-58. In his responsive pleading, plaintiff affirms the fact that he was attempting to resist (regardless of any belief it would have been futile). "In fact, Steibel had a limited right to resist his unlawful arrest . . .". Plaintiff's Memorandum in Opposition (#41), pg. 10.

At his deposition, plaintiff repeatedly testified that Locke "charged him" and "slammed him" up against a van, then upon falling to the ground, Locke continued to wrestle with him, and subdued plaintiff by kneeing him in the back, and pulling his arms behind him to handcuff the plaintiff. Plaintiff's Deposition, pgs. 43-45,54-59. He contends that his head and back hurt from contact with the van. Plaintiff's Deposition, pg. 45. He further contends that his right knee hurts from the incident. Plaintiff's Deposition, pgs. 46, 53-54. Finally, he contends that he was bleeding profusely from his left wrist and arm due to the struggle and being handcuffed. Plaintiff's Deposition, pgs. 61-62.

> "Q. Okay. When he pushed you into the van, did he hurt your
> you at that point?
> A. Oh, I hope to tell you.
> Q. When he pushed you into the van, it hurt?
> A. Yeah.
> Q. What hurt? What part of your body hurt you?
> A. Well, my right knee, which my right leg don't work always
> good. I wouldn't say its perfect, but it got pushed around kind
> of backwards next to me.
> Q. How did that happen?
> A. He started slamming me around on the ground, throwed
> me on the ground, and he'd jump on me.
> Q. Now, wait a second. What I want to know is when he
> pushed you into the van - - We're going to go step by step.
> Did any part of your body hurt you from him pushing you
> into the van?
> A. The back of my head, my back.
> Q. The back of your head? Did you get –
> A. My back, my right leg.
> Q. Did you get any cuts on the back of your head?
> A. No. It wasn't split.
> - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
>
> Q. Okay. What happened next?
> A. I don't know if he kicked my leg out from underneath me
> or it just slid out, but he jumped on top of me and started putting
> cuffs on, hollered, `You're under arrest.'
> Q. Okay. So you're not sure if your leg just slid under, just gave
> way, just kind of - -
> A. Right.
> Q. Or if he kicked your leg is what you're saying?
> A. I'm not sure.
> Q. But you don't know?
> A. No.
> Q. Okay. Did he hurt your leg?
> A. It's worse than it used to be. I had problems before, but it worse
> that it used to be now.
> Q. What do you mean its worse than it used to be ?
> A. Well, before I could probably walk - - I used to walk around the

block.  I don't walk around the block.  I can walk up about halfway
to the corner and back.  By that time its bigger than its supposed to be.
Q.  Your knee is - -
A.  And - -
Q.  Well, wait a second.  So its your knee that's bothering you,
you say?
A.  Yeah.
 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q.  Okay.  Was there anything else that he did to you after that?
**[referring to after plaintiff was standing up and handcuffed]**
       **Mr. Schock: You mean physically.**
       **Ms. Gunn: Yes.**
Q.  No?
A.  No.  Not once I was up, uh-uh.
Q.  All right.  Did he hurt you?
A.  Yeah, he hurt me.
Q.  Okay.  What did - How did he hurt you?
**[There is discussion between counsel as to plaintiff's understanding
of the question.]**
Q.  Do you understand my question, Mr. Steibel?
A.  Yeah.
Q.  Okay.  Why don't you go ahead and answer it then?
A.  Okay.  You mean how he hurt me?
Q.  Yeah.
A.  Well you can still see the scar across here yet.  As he yanked on
the handcuffs, the handcuffs went through all the meat that was on
the bone, and he was yanking on them.  Blood's going everywhere.
From throwing me around like he did, I had little pieces of gravel
and stuff stuck in me.
Q.  Stuck in where?
A.  In my arm.
Q. On your left - -
A.  In my face.
Q.  On your left arm?
A.  Both arms, I think.  I believe this one had a couple of spots
on it, too.
Q.  Okay.  And any - - So he - - There is a scar across your
left wrist, and there was gravel in both arms and on your face?
A.  Yeah.
Q.  Okay.  Anything else that he did to hurt you?
A.  Just yanking around with the handcuffs on, you know, to make
sure he would yank you instead of letting you walk.
Q.  Okay.  Well, my question is did that, I mean, injure you or hurt
you when he did that?
A.  Well, it was so wide it couldn't be sewed up.  They had to
butterfly the thing.  And it took - - it took probably three or four
months to even get to where you can't hardly see it, you know.
But that was a big, big, wide, deep scar.
Q.  On your left wrist?
A.  Yeah.  Completely to the bone on top, not on the bottom,
but on top.
Q.  Okay.  Anything else?
A.  I was just beat up all over, you know.
Q.  I need for you to tell me about what hurt you.  I mean,

what he did to hurt you, what hurt you and how he did that to you.

A. My right leg hurt a lot.

Q. I'm sorry?

A. My right leg hurt a lot.

Q. Okay. And that's your knee; right?

A. Yeah. My left arm.

Q. Wait. Let me ask you. Your right knee began to hurt immediately; is that correct?

A. Right. Exactly.

Q. Okay.

A. My left arm.

Q. And you said you still have a scar?

A. Yeah. It's still there.

Q. Okay.

A. Right across there (indicating).

Q. Okay. Now, you have some darkened area on the skin of your hand and your wrist. What's that from?

A. Oh, blood gets to there. You know, I'll get these things and they'll all go away, but that's another thing. This hand here was like that (indicating). It's never went away.

Q. Was that because - - I mean, did that happen - - I mean, it turned dark?

A. Oh, yeah. It was completely black after a couple of days.

Q. Had it been that color before?

A. No.

Q. So your arm - -

A. Just like that.

Q. Your hand was not the same color it was now before - -

A. No.

Q. - - the incident with Chief Locke is what you're telling me?

A. Well, you get these little spots once in a while, but they just go away. Like here's something I hit three or four days ago that's almost gone (indicating). This hand has never came back, got normal color back in it again.

Q. Okay.

A. See some of these little lines and tears through here?

Q. Yes.

A. That's where the meat was tore up, and for some reason the darkness, whatever this is, is some kind of blood I guess underneath here. I'm not sure what it is. But wherever I was tore up at it left scars. Like here, you know (indicating). I didn't have nothing like that before. Gravel and stuff got stuck in me. It's a weird deal. I don't know.

Q. Is the reason why you have skin that's discolored, is that because of that disease you have?

A. Yeah, exactly.

Q. Okay. Like if you didn't have that disease, it would have healed properly; correct?

A. I don't know.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q. You have some scars on your back?

A. Well, yeah. There was like gravel stuck all over me.

Everywhere was scarred up.
Q. Gravel on your back?
A. Yeah.
Q. Did you have a shirt on?
A. Well, it kind of got away a little bit.
Q. How many places in your back did you have gravel?
A. You know, I'm not even sure. They just cleaned up a bunch of spots, put little Band-Aid like things on them, you know, just cleaned it up and stick Band-Aids on it.
Q. Okay.
A. As the weeks go on, had the wife or kid change them, you know, every day or so, and finally just don't need them anymore, so that was the end of that.
Q. How long did you have to wear those Band-Aids?
A. The Band-Aids, only about - - I think probably about a week or so.
Q. You didn't have stitches; did you?
A. **[apparently in reference to the injury on his left wrist]** No. It was too wide. They couldn't stitch it. It was literally about three-eighths wide or about - - That's about three-eighths.
Q. The width of a pen?
A. Yeah. It was that wide. So they couldn't stitch it up. It was too wide to stitch up.
Q. Okay. And is the reason why it was - - I mean, the reason why it was wide like that and they couldn't stitch it wis because of that condition that you had, that Wegener's Disease?
A. No. From him yanking on the handcuffs.
Q. Was there anything else that Chief Locke did to hurt you or any other injuries that you received?
A. I was just sore for a week or so, you know.
Q. I'm sorry?
A. Everything was sore for a week or so. Like being in a car accident, you know.
Q. Right.
A. You can be bruised and sore, you know.
Q. Okay.

Plaintiff's Deposition, pgs. 45-46, 60-66.

Other than his deposition testimony, plaintiff submits black and white copies of photographs of his left wrist and part of his left arm. Plaintiff's Exhibits M, N, and O. According to plaintiff's deposition testimony, these three (3) photographs were taken by plaintiff's employee "Dwayne" approximately 2-3 weeks after the incident. Plaintiff's Deposition, pgs. 81-82. The Court finds the photos admissible for purposes of this summary judgment review; however, they are of little evidentiary weight. Since the photos are in black and white, any residual bruising is difficult to distinguish. Furthermore, since there are no photos of the plaintiff's left wrist or arm immediately following the incident, the Court cannot compare his "immediate" injuries to those

allegedly present in these photos.  Finally, since plaintiff has testified that he sustains bruising and discoloration on his hands, arms, wrists, etc. on an regular basis (ostensibly due to his Wegener's Disease), the Court cannot determine if the bruising and discoloration allegedly present in these photos are a direct result of the incident of October 18, 2007.

The only medical evidence before this Court is the affidavit of Dr. Stephen Palmer. Exhibit B to Document #45.  In his affidavit, Dr. Palmer says he has reviewed the medical records from the Affton Fire Protection District, as well as the medical records from St. Anthony's Medical Center emergency room pertaining to the plaintiff and the incident of October 18, 2007. Furthermore, Dr. Palmer states that he has reviewed **color photographs** of the plaintiff's arms and wrists following the incident involving defendant Locke.  Finally, Dr. Palmer states that he has reviewed other medical records of the plaintiff which relate to the various care and treatment he has received over the years.[11]  In his affidavit, Dr. Palmer states that plaintiff has been diagnosed with Wegener's Disease and that "[T]he medical records further reflect Mr. Steibel underwent a regimen of chronic prednisone therapy prior to his encounter with the police.  Based upon my training and experience, the prednisone therapy caused Mr. Steibel's skin to become atrophic and fragile."  Palmer Affidavit.  Dr. Palmer further states that "[I ] further saw references in Mr. Steibel's medical records to bruising on the arms and hands which predated Mr. Steibel's encounter with the police."  Palmer Affidavit.  Dr. Palmer concludes:

> "Based on the medical records and on my training and experience, on the date of Mr. Steibel's encounter with the police, his skin was in such a condition that any minor trauma, insult or strain, including pressure which Mr. Steibel may have exerted himself against the handcuffs was sufficient to cause the bruising and skin tears which are depicted in the photographs, and which are referenced in the emergency room medical records.
>
> It is my opinion that some of the bruising shown on the photographs I reviewed may predate his encounter with the police."

Palmer Affidavit.

---

[11]Once again, the Court notes that neither the plaintiff nor defendant Locke have submitted for this Court's review any medical records from any source pertaining to either the incident of October 18, 2007 or the plaintiff's past medical care and treatment.

Reviewing all the evidence before the Court in a light most favorable to the plaintiff, the Court finds that plaintiff has failed to carry his burden in showing that the force used to effectuate his arrest was not "objectively reasonable" under the circumstances. Defendant Locke encountered an angry man, waving his arms, yelling, and using profanity. Plaintiff refused to step back and continued approaching Locke as he was in the midst of processing a traffic violation. There was a struggle, and both men fell to the ground. *Assuming arguendo*, that plaintiff was face down on the ground, he was still attempting to prevent Locke from grabbing ahold of his arms to get them behind plaintiff's back to handcuff him. *Assuming arguendo*, that Locke placed his knee into plaintiff's back twice, given plaintiff's resistance, such a maneuver was necessary to get ahold of his arms and keep the plaintiff down on the ground until he was handcuffed.

Furthermore, there is absolutely no medical evidence to support the plaintiff's allegations of serious injuries to his right knee, left wrist, and left arm.[12] Plaintiff's own testimony is that he suffered scrapes and bruising. The scrapes only required the short-term temporary use of Band-Aids, and possibly some antiseptic cream. As for his left wrist/hand and/or arm, plaintiff's own testimony is that he sustained a gash possibly less than a half-inch wide requiring no stitches; albeit he has a scar. However, he has testified that he has no residual problems with the hand, wrist or arm; i.e. they work "pretty good". He admits that any bruising sustained is not unusual for him given his Wegener's Disease; a fact supported by Dr. Palmer. Plaintiff testified that within a week or so he felt fine enough to go to Florida for an extended period of time. Plaintiff testified that none of his scrapes or bruising necessitated any follow-up medical care.

As for his knee, plaintiff testified that he had on-going problems with the knee which necessitated him wearing a brace prior to this incident. He testified that the knee did hurt and swell while in Florida; however, he did not return to Missouri to see his regular physician. Instead, he had an MRI[13] and saw an unidentified chiropractor in Florida. This unidentified

---

[12]Although it is unclear from the plaintiff's pleadings, it appears that he is not including any alleged injuries to his head, back or face in support of his excessive force claim.

[13]The Court will presume for purposes of this review that the scan plaintiff refers to in his deposition is a MRI.

chiropractor first diagnosed plaintiff's knee problem as somehow related to his back; then, upon seeing the MRI, told plaintiff he had a small tear. Plaintiff testified that the chiropractor told him the tear would heal itself and did not prescribe any further medical treatment, including surgery. Plaintiff has testified that he has not sought any medical treatment for his knee, and no medical provider has told him that his knee problem; i.e .the presumed tear[14], is the result of his encounter with defendant Locke. The only problem plaintiff contends he presently has with the knee is that he cannot walk as far as he could a couple of years ago prior to the encounter. However, plaintiff himself cannot link his knee problem directly to his encounter with Locke; instead, viewing his "aches and pains" as part of the normal aging process.

In this case, Steibel alleges at most very minor injuries. His bruising, scrapes, and even skin tearing at wrist are nothing more than the temporary and slight aggravation of his pre-existing condition (Wegener's Disease). *See*, Andrews v. Fuoss, 417 F.3d. 813, 818-19 (8th Cir. 2005). Witnesses state that plaintiff resisted being handcuffed, plaintiff admits to resisting being handcuffed, and Dr. Palmer attributes the bruising and discoloration (apparently visible in the photos he saw) to plaintiff's own actions. Furthermore, the record is undisputed that Locke was unaware of the plaintiff's condition during the struggle, and upon seeing plaintiff bleeding at the wrist, obtained medical care for him and had the handcuffs removed. *See*, Janis v. Biesheuvel, at 800 (district court rejects excessive force claim because officers did not know decedent's action were a result of a diabetic seizure and not intoxication, did not know what level of risk decedent posed at the time, and upon learning of decedent's medical condition had handcuffs removed and administered medical attention; court found use of force used was "measured, brief, and appropriate").

The Court finds that the force used was appropriate given the situation at hand. Furthermore, since some force was required to arrest and handcuff Steibel, his relatively minor scrapes and bruises, and the stiffness of his knee are *de minimus* injuries. Since plaintiff has failed

---

[14]Again, there are no medical records before this Court. The only "evidence" of a "tear" is what the plaintiff states he was told by the unidentified chiropractor. However, the plaintiff was confused as to what the medical term or condition was regarding this "tear"; even going so far as to call it "lipis' or "lupus".

to produce any affirmative evidence of any serious or permanent injuries attributable to defendant's use of force in effectuating plaintiff's arrest, plaintiff's claim for excessive force in violation of the Fourth Amendment fails.[15]

## Count III - Municipal Liability

Since plaintiff has failed to meet his burden in proving a deprivation of his constitutional rights, his §1983 claim against defendant City of Bella Villa must fail. Williams v. City of Carl Junction, Missouri, 480 F.3d. 871, 878 (8th Cir. 2007); *see also*, Monell v. Dept. of Soc. Services of New York, 436 U.S. 658, 694 (1978).

Even if this were not the case, plaintiff still has failed to set forth any affirmative evidence by which a reasonable juror could find the City of Bella Villa liable because 1) defendant Locke is a "final policy-maker"; 2) the City delegated final policy-making authority to Locke; or 3) the City was aware of a "pattern of transgressions" regarding excessive force by Locke.

Liability under §1983 for a governmental entity must be based upon an official custom, policy, or practice of the city that causes the constitutional deprivation, Monell v. New York City Department of Social Services, 436 U.S. 658, 690-94 (1978); Davison v. City of Minneapolis, Minnesota, 490 F.3d. 648 (8th Cir. 2007); Granda v. City of St. Louis, 472 F.3d. 565, 568 (8th Cir. 2007); Avalos v. City of Glenwood, 382 F.3d. 792, 802 (8th Cir. 2004), or is so pervasive among non-policymaking employees of the municipality so "as to constitute a custom or usage with the force of law." Granda, at 568 *quoting* Kuha v. City of Minnetonka, 365 F.3d. 590, 603 (8th Cir. 2003). Liability will not attach simply because the municipality employs the alleged tort-feasor. Monell, 436 U.S. at 694.

"Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability." Russell v. Hennepin County, 420 F.3d. 841, 846 (8th Cir. 2005) *quoting* Angarita v. St. Louis County, 981 1537, 1546 (8th Cir. 1992)(*citing* St. Louis

---

[15]As with the plaintiff's Fourth Amendment unlawful arrest claim, since plaintiff has failed to meet his burden of proving that a material issue of fact exists as to whether his Fourth Amendment right against excessive force was violated, the Court will not go any further with a qualified immunity inquiry. Thus, having found no constitutional violation as to plaintiff's Fourth Amendment right to be free of excessive force, defendant Locke is entitled to qualified immunity on this claim also.

v. Praprotnik, 485 U.S. 112, 121-22 (1988)).  Although proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, *see,* Davison, *supra.*, *citing* Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), "an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."  Davison, *supra.*, *quoting* Praprotnik, 485 U.S. at 123; *see*, Angarita, at 1546.

There is a distinction between final policymaking authority and final decisionmaking authority.  In Pembaur v. City of Cincinnati, 475 U.S. 469 (1986),  the Supreme Court supplemented its pronouncement that "[t]he fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  Id., 475 U.S. at 483, n.12.  For example, a county sheriff may have the discretion to hire and fire sheriff department employees but this does not make his the county official responsible for establishing county employment policy.  This would be true even if the county sheriff exercised that discretion in an unconstitutional manner.  *See*, Davison, *supra. citing* Pembaur, 475 U.S. at 483, n.12.  Whether an official had final policymaking authority is a question of state law.  Pembaur, 475 U.S. at 483 (noting that "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority.").

"Claims against a municipality based on the acts of an individual officer or entity instead of a written policy or code have succeeded in circumstances where the action was not `subject to significant review' because the officer was in a `policy making position . . . represent[ing] the official policy of the municipality.'" Granda, at 568 *quoting* McGautha v. Jackson County Collections Dept., 36 F.3d. 53, 56 (8th Cir. 1994).  However, before a municipality can be held liable, there must be an unconstitutional act by the municipal employee or official.  Russell, at 846; Avalos, at 802.  A municipality is not liable under §1983 for the negligent acts of its employees/officials.  Russell, at 846 *citing* Daniels v. Williams, 474 U.S. 327, 330-31 (1986); *see also*, Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 405 (1997).

"A 'policy' is a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible [under state law] for establishing final policy with respect to the subject matter in question.'" Russell, at 847 *quoting* Hayes v. Faulkner County, 388 F.3d. 669, 674 (8th Cir. 2004)(*quoting* Pembaur, 475 U.S. at 483-84). "A policy is deliberately indifferent to a person's constitutional rights when its inadequacy is both obvious and likely to result in the alleged deprivation of constitutional rights." Russell, at 847 (citation omitted).

If the alleged constitutional violator is not a "final policymaker", then liability may be established by showing that the alleged misconduct was so persistent among the rank-and-file employees of the municipality as to constitute a "custom" with the "force of law". "A municipal custom is a practice of municipal officials that is not authorized by written law, but which is 'so permanent and well-settled . . as to [have] the force of law.'" Russell, at 849 *quoting* Harris v. City of Pagedale, 821 F.2d. 499, 504, n7 (8th Cir. 1987)(*quoting* Monell, 436 U.S. at 691). In order to establish a constitutional violation resulting from a municipal custom, a plaintiff must show that his/her alleged injury was caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized. Russell, at 849 *citing* Larson v. Miller, 76 F.3d. 1446, 1453 (8th Cir. 1996)(en banc). Central to this standard is that the alleged misconduct must be "pervasive constitutional violations"; thus, liability for an unconstitutional custom or practice cannot arise from a single act. McGautha, at 56-57 (citations omitted).

The plaintiff's arguments contending that either Locke was a final policy-maker or Bella Villa delegated final policy-making duties to him are confusing, and a bit contradictory. In his "statement of additional facts, seen in plaintiff's favor" (Document #41-2), plaintiff first states that "[T]he Bella Villa Board of Alderman is formally responsible for making policies for the police department and Chief Locke has no such formal authority." Document #41-2, pg. 9, ¶54. He further states that "[C]hief Locke oversees the day-to-day operations of the Bella Villa Police Department." Document #41-2, pg. 9, ¶55. However, he then submits the City of Bella Villa Personnel Policy and Procedures Manual (Plaintiff's Exhibit 8) contending that it contains no

provisions related to specific duties of police work. Document #41-2, pg. 10, ¶57. He further contends that there is no police manual and that "[T]he Bella Villa Board of Alderman has never made a single policy specifically for the Bella Villa Police Department . . .". Document #41-2, pg. 10, ¶¶58 and 59.

Even with the lack of a formal policy book for the police department or a written police manual, the evidence before this Court (again) is that the Mayor and the Board of Alderman are the final policy-makers for the police department. Locke has administrative authority regarding the daily operations of the police department; however, he must confer with and seek approval from the Mayor and the Board of Alderman for any policies, if any, he wishes to implement in the police department. Based upon the evidentiary record in this case, and this Court's findings regarding similiar municipal liability claims in other cases involving Bella Villa[16], the Court finds that plaintiff has failed to demonstrate that either defendant Locke had final policy-making authority for the Bella Villa police department or that either the Mayor or the Board of Alderman delegated its policy-making authority to Locke concerning the use of force in effectuating an arrest.

Plaintiff's remaining claim for municipal liability is that Bella Villa has ignored a "pattern of transgressions" regarding defendant Locke and his alleged use of excessive force. In support of this claim, plaintiff offers two (2) letters of complaint and the fact that he has filed several other lawsuits against Bella Villa. Both of these arguments are meritless.

Firstly, the deposition testimony of Mr. Peery regarding a letter of complaint by an unidentified person in Indiana[17] clearly shows that the letter was only concerned with "rude remarks" by Locke. Furthermore, the Board of Alderman, upon examination of the police car video of the traffic stop, completely exonerated Locke as to this charge. Secondly, the other

---

[16]*See*, <u>Schmidt v. City of Bella Villa, et. al.</u>, 557 F.3d. 564 (8th Cir. 2009) *aff'g* 2007 WL 2159469 (E.D.Mo. July 26, 2007); <u>Cook v. City of Bella Villa</u>, *supra.* (after trial, the district court granted a Rule 50 Fed.R.Civ.P. motion for judgment as a matter of law on all claims, including municipal liability); <u>Tunnell v. City of Bella Villa</u>, *supra.* (summary judgment granted on municipal liability claims).

[17]This letter is not before the Court.

letter of complaint by DZ also only complains of "rudeness" and unidentified acts of "harassment" by Locke.  Again, no allegations of excessive force.

As for the other lawsuits involving Locke and/or the City of Bella Villa, this Court has already found that "other lawsuits are not `evidence' of a `pattern of transgressions' but simply people **alleging** that the rights have been violated."  *See*, Tunnell v. City of Bella Villa, 4:07CV77, Document #59, pg. 15.  Recently, in Scherrer v. City of Bella Villa, 4:07CV306CEJ, the Court, after noting that plaintiff had cited other lawsuits in support of his municipal liability "pattern of transgressions" claim, stated: "However, each of these cases has been fully adjudicated in favor of the City of Bella Villa.  A pattern of unsuccessful lawsuits against a party is not sufficient to establish a pattern of transgressions by that party."  Scherrer v. City of Bella Villa, 2009 WL 440484 (E.D.Mo. Feb.20, 2009).   At best, even if plaintiff had carried his burden of establishing excessive force by Locke in this case, this is only one incident, and one incident is not enough to prove municipal liability.  McGautha, *supra.*

Defendant City of Bella Villa is entitled to summary judgment on Count III as a matter of law.

## Count IV - *Respondeat Superior*

Finally, plaintiff's last claim is for municipal liability based upon the doctrine of *respondeat superior*.  It is well-established that municipalities are not subject to *respondeat superior* or vicarious liability under §1983.  Monell, 436 U.S. at 694.

In light of the above findings of facts and conclusions of law, this Court determines that plaintiff has failed to make a submissible case of an existing issue of material fact regarding his arrest and the use of force to effectuate that arrest, and that defendants are entitled to summary judgment as a matter of law.

Dated this _____22nd_____ day of May, 2009.

_____
UNITED STATES DISTRICT JUDGE